**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4127**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SEUN BANJO OJEDOKUN,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:19-cr-00228-PWG-1)

Argued:  September 23, 2021               Decided:  October 26, 2021

Before GREGORY, Chief Judge, KING, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Chief Judge Gregory and Judge Floyd joined.

**ARGUED:**  Brent Evan Newton, Gaithersburg, Maryland, for Appellant.  John Michael Pellettieri, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Jonathan F. Lenzner, Acting United States Attorney, Nicholas L. McQuaid, Acting Assistant Attorney General, Daniel S. Kahn, Acting Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas P. Windom, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

KING, Circuit Judge:

Following a jury trial in the District of Maryland, defendant Seun Banjo Ojedokun was convicted of conspiracy to commit money laundering, in contravention of 18 U.S.C. § 1956(h). Ojedokun's conviction arose from his conspiratorial conduct in Nigeria, which involved efforts to distribute and conceal the proceeds of an extensive fraud scheme based in the United States. In 2019, after relocating to this country, Ojedokun was questioned and arrested by the FBI at his Illinois home and was thereafter indicted in Maryland. The grand jury returned a superseding indictment in August 2020, which Ojedokun unsuccessfully moved to dismiss as untimely. Ojedokun filed multiple unavailing suppression motions, was convicted and sentenced to 108 months of imprisonment, and subsequently moved for a new trial. Following the district court's denial of that motion, Ojedokun filed a motion for reconsideration, asserting the court lacked subject matter jurisdiction by reason of an inappropriate application of § 1956's extraterritorial jurisdiction provision. The court likewise rejected that motion.

Ojedokun has timely appealed his conviction and sentence to this Court, asserting the following: (1) the district court did not possess extraterritorial jurisdiction over the § 1956(h) conspiracy charge; (2) the superseding indictment was time-barred; (3) the FBI's entry into Ojedokun's home ran afoul of the Fourth Amendment; and (4) Ojedokun's trial counsel rendered ineffective assistance under the Sixth Amendment. As explained herein, we concur with the district court's determinations as to extraterritorial jurisdiction and the timeliness of the superseding indictment. We further find no colorable Fourth Amendment

2

violation and decline to reach Ojedokun's Sixth Amendment ineffective assistance of counsel claim. Accordingly, we affirm.

## I.

## A.

The criminal proceedings against Ojedokun grew out of a complex international operation designed to obscure the proceeds of a U.S.-based fraud scheme. That scheme principally involved contacting elderly victims by way of internet dating websites, where coconspirators, posing as romantic partners facing financial difficulties, would persuade their targets to surrender large sums of money. The fraud victims frequently paid the coconspirators tens or hundreds of thousands of dollars, only later to realize that their supposed newfound romantic connections were a sham.

Upon completion of the ploy, the fraud victims' money would be deposited into bank accounts controlled by various members of the conspiracy, including Gbenga Benson Ogundele, a United States citizen living in Laurel, Maryland, who served as the principal coordinator of the scheme. The coconspirators agreed to arrange financial transactions designed to promote the underlying scheme and to conceal the source of its proceeds by distributing the money among geographically scattered members of the conspiracy.

Ojedokun lived and worked in Lagos, Nigeria, throughout the conspiracy. For his part, Ojedokun would send and receive by email information concerning the fraud victims' payments, including electronic documents confirming bank account deposits. Deposit slips and other wire transfer documents forwarded to Ojedokun's two email accounts would

3

oftentimes be altered to reflect an inflated sum of money. The documents would then be dispatched from the accounts to other members of the conspiracy, including Mukhtar "Mukky" Haruna in Nigeria and eventually Ogundele in Maryland. Those emails would pass through a lengthy series of coconspirators, usually without comment in the body of the messages, so as to aid in concealing the origin of the fraud proceeds. The government later alleged that the conspiracy continued between either 2011 and 2015 or 2013 and 2015.

Ojedokun first came to the United States in 2017, intending to pursue a doctoral degree in chemistry at the Illinois Institute of Technology. On April 25, 2019, shortly before 8:00 a.m., an FBI agent from the Baltimore, Maryland complex financial crimes division, along with a special FBI agent from Chicago, knocked at the door of Ojedokun's home in the South Side of Chicago. When Ojedokun emerged from the home, the agents identified themselves by name, displayed their FBI credentials, and asked Ojedokun if he would be willing to speak with them. More specifically, the agents asked Ojedokun if he "ha[d] a moment" to answer "a few questions . . . a couple of questions about some people you may have known, uh, back in Nigeria." *See* J.A. 1114.[1] To that inquiry, Ojedokun replied, "Okay." *Id.* at 1115. One agent then asked, "Can we talk? . . . Inside? Or . . . ," to which Ojedokun replied, "Oh, either way." *Id.* The agent asked, "Okay, can we go in?," and Ojedokun again replied, "Okay." *Id.* The agents and Ojedokun then went inside and were seated at Ojedokun's kitchen table.

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Once inside, one of the agents informed Ojedokun that the interview was "completely voluntary" and further stated, "[I]f you don't want to answer my questions, you don't have to." *See* J.A. 1116. Ojedokun again responded, "Okay," and the agents proceeded to interview him for roughly one hour. *Id.* The interview primarily concerned Ojedokun's time spent in Nigeria and his use of the two email accounts utilized in distributing the wire transfer documents. During the interview, Ojedokun made incriminating statements pertaining to the email accounts and the conspiracy, confessing that he had sent and received the emails in question. Ojedokun also made repeated reference to a "friend" who he called his "brother," and an agent asked Ojedokun to retrieve the friend's phone number from his cell phone. *Id.* at 1140-42. When Ojedokun could not locate the number, the agent requested to see the phone. Ojedokun replied, "Sure, that's fine," and signed a consent form for a search of the device's contact information. *Id.* at 1142-44. At the conclusion of the interview, the agents arrested Ojedokun and seized the cell phone.

B.

On May 6, 2019, the grand jury in the District of Maryland returned an indictment charging Ojedokun with a single count of conspiracy to commit money laundering, in contravention of the Money Laundering Control Act (the "MLCA"), 18 U.S.C. § 1956. *See United States v. Ojedokun*, No. 8:19-cr-00228 (D. Md. May 6, 2019), ECF No. 6 (the "Original Indictment"). Section 1956(a)(1) provides for two substantive offenses relevant to this case, known as "promotion" and "concealment" money laundering. Both require as an element "conduct[ing] . . . a financial transaction" involving "the proceeds of specified

5

unlawful activity." *See* 18 U.S.C. § 1956(a)(1); *see also United States v. Bolden*, 325 F.3d 471, 486-87 (4th Cir. 2003) (explaining distinction between promotion and concealment offenses). The statute defines "specified unlawful activity" to include, inter alia, those offenses set out at 18 U.S.C. § 1961(1), a list which includes — as pertinent to this appeal — wire fraud in contravention of 18 U.S.C. § 1343, but not conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Section 1956(h) makes unlawful conspiring to commit promotion or concealment money laundering, providing:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

*See* 18 U.S.C. § 1956(h).

The Original Indictment alleged that the money laundering conspiracy lasted from January 2011 to March 2015. Notably, it identified the "specified unlawful activity" generating the proceeds to be laundered as "conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349." *See* Original Indictment 2-3. The Original Indictment detailed the mechanics of the "internet-based romance scam" and maintained that Ojedokun's coconspirators used certain "drop accounts" to receive millions of dollars from fraud victims, caused those victims to wire money into the accounts, and disbursed the victims' money by way of wire transfers and other conveyances. *Id.* at 2-4. It further alleged that Ojedokun joined with the coconspirators — including Haruna and Ogundele — in sending and receiving emails evidencing the account deposits with the conscious objects of "promot[ing] criminal conduct" and "conceal[ing] and disguis[ing] the nature, location, source, ownership, and control of the proceeds" of the fraud scheme. *Id.* at 3.

6

On August 10, 2020, the grand jury returned the operative superseding indictment, once again charging Ojedokun with a single count of conspiracy to commit money laundering in contravention of § 1956(h). *See United States v. Ojedokun*, No. 8:19-cr-00228 (D. Md. Aug. 10, 2020), ECF No. 79 (the "Superseding Indictment"). The Superseding Indictment retained — substantially verbatim — the Original Indictment's allegations as to "drop accounts," bank deposits by the fraud victims, emails used to distribute deposit confirmation documents, disbursal of the proceeds, and the objects of "promot[ing] . . . criminal conduct" and concealing and disguising "the nature, location, source, ownership, and control of the proceeds." *See* Superseding Indictment 1-4. The Superseding Indictment differed from its predecessor in two principal ways: first, it alleged the conspiracy lasted only from 2013 to March 2015, and second, it identified "wire fraud in violation of 18 U.S.C. § 1343" as the predicate "specified unlawful activity," as opposed to mere conspiracy to commit wire fraud. *Id.* at 3. The government later conceded that the Original Indictment alleged a non-qualifying "specified unlawful activity" but maintained that the Superseding Indictment cured that defect and related back to the return date of the Original Indictment.

C.

Prior to the return of the Superseding Indictment, Ojedokun filed three pre-trial motions to suppress. The first motion asserted that Ojedokun's statements made during the FBI interview should be excluded from trial because (1) he was in custody during the interview and was not given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) the statements were involuntarily given. The remaining motions contended

7

that Ojedokun had not given knowing or voluntary consent to the search of his cell phone and that a search warrant for the records of Ojedokun's email accounts was issued in the absence of probable cause, all in violation of the Fourth Amendment. Accordingly, those motions argued that the contact information and emails obtained from the cell phone should be suppressed. At an August 18, 2020 suppression hearing, the district court heard testimony from Ojedokun and the FBI agents and orally denied the motions. The court concluded that the 2019 interview did not amount to a custodial interrogation and that Ojedokun accordingly was not entitled to *Miranda* warnings. The court further ruled that Ojedokun's decision to answer the agents' questions and to permit the search of his cell phone were fully voluntary, and that the contested search warrant was founded on probable cause. As relevant to this appeal, Ojedokun's trial counsel did not move to suppress the statements and cell phone data on grounds that the agents' entry into Ojedokun's home violated the Fourth Amendment because he did not provide valid consent to do so.

Following the denial of his suppression motions, Ojedokun filed a motion to dismiss the Superseding Indictment, averring the indictment was time-barred because it could not relate back to the date of the Original Indictment. Because both indictments alleged the conspiracy terminated in March 2015, Ojedokun explained that the August 2020 Superseding Indictment was untimely under the applicable five-year statute of limitations unless it related back to the May 6, 2019 return date of the Original Indictment.[2] Ojedokun

---

[2] The applicable statute of limitations for non-capital offenses provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the (Continued)

8

maintained that by substituting "wire fraud in violation of 18 U.S.C. § 1343" for "conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349" as the "specified unlawful activity" required for the § 1956(a)(1) substantive money laundering offenses, the government had "materially broaden[ed] and/or substantially amend[ed] the charges against [him]," such that the Superseding Indictment could not relate back to the date of the Original Indictment. *See* J.A. 233; *see also United States v. O'Bryant*, 998 F.2d 21, 23 (1st Cir. 1993).

At a hearing on August 26, 2020, the district court orally denied Ojedokun's motion to dismiss. The court explained that the inquiry as to whether a superseding indictment "materially broadens or substantially amends" an earlier indictment turns on whether the first indictment put the defendant on notice of the nature of the ultimate charges against him, thereby allowing him to prepare an adequate defense. The court emphasized that "the inquiry is not confined to the statutes under which the defendant is charged" but rather to the factual allegations on which the government relies. *See* G.S.A. 7-9.[3] After considering a redline comparison of the Original and Superseding Indictments and the allegations contained therein, the court determined that the Original Indictment afforded Ojedokun sufficient notice of the Superseding Indictment's charges, and consequently, that the later indictment was not a "curveball" that materially broadened or substantially amended the

---

indictment is found or the information is instituted within five years next after such offense shall have been committed." *See* 18 U.S.C. § 3282(a).

[3] Citations herein to "G.S.A. __" refer to the contents of the Supplemental Appendix filed by the government in this appeal.

9

earlier version. As such, the court ruled that the Superseding Indictment related back to the return date of the Original and was not time-barred.

Ojedokun's jury trial began on September 8, 2020. During trial, the government presented the testimony of multiple fraud victims and relied on bank records, telephone communications, messages sent to and from the email accounts, as well as Ojedokun's statements to the FBI agents to show that he joined with Ogundele and other coconspirators in an effort to launder the proceeds of the fraud scheme. Ojedokun testified in his own behalf and denied any involvement, claiming that he worked at a "cyber café" in Nigeria during the alleged course of the conspiracy where he frequently shared his passwords and email accounts with customers. Ojedokun admitted to sending emails containing wire transfer documents but insisted that he sent them on behalf of café customers and denied knowing or otherwise conspiring with Haruna, Ogundele, or any other involved parties. The jury concluded to the contrary and, on the sixth day of trial, returned a guilty verdict.

D.

Following his conviction, on September 29, 2020, Ojedokun timely filed a post-verdict motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. Alongside other lines of argument, Ojedokun revived his suppression and statute of limitations contentions as bases for a new trial. By its letter order of November 17, 2020, the district court denied Ojedokun's Rule 33 motion, explaining that the motion's arguments already had been presented to and ruled on by the court.

Ojedokun thereafter obtained new counsel and filed with the district court a motion for reconsideration, again raising his statute of limitations argument as well as, for the first

10

time, a claim that his § 1956(h) conviction was founded on an improper exercise of extraterritorial jurisdiction. Relative to the statute of limitations issue, Ojedokun relied on our decision in *United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995), for the proposition that an indictment charging a § 1956(h) conspiracy offense must allege, as an essential element of that offense, the particular predicate offense constituting the "specified unlawful activity" required for the substantive money laundering crimes. With that being the case, according to Ojedokun, a change to the statutory offense qualifying as the "specified unlawful activity" — as occurred in this case — would necessarily "broaden" or "substantially amend" the scope of an earlier indictment, such that the superseding indictment making such a change could not relate back to the date of its predecessor.

On the matter of extraterritorial jurisdiction, Ojedokun argued that the district court lacked subject matter jurisdiction to hear the charge against him because the extraterritorial jurisdiction provision of the MLCA — § 1956(f) — did not overcome the longstanding "presumption against extraterritoriality" with respect to his overseas money laundering conspiracy offense. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Section 1956(f) provides:

> There is extraterritorial jurisdiction over the conduct prohibited by this section if—
>
> (1) the conduct is by a United States citizen or, in the case of a non-United States Citizen, the conduct occurs in part in the United States; and
>
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

11

*See* 18 U.S.C. § 1956(f). Ojedokun averred in his reconsideration motion that subsection (f) could not rebut the presumption against extraterritoriality in his case because, under *Whitfield v. United States*, 543 U.S. 209, 214 (2005), a subsection (h) conspiracy requires only a "mere agreement" for the offense to be completed, not an overt act in furtherance of the conspiracy. As his conspiratorial conduct occurred entirely in Nigeria and his coconspirators' acts in furtherance of the conspiracy undertaken in the United States were not pertinent to his own culpability, Ojedokun maintained that his actions did not constitute conduct occurring "in part in the United States" within the scope of § 1956(f)(1).

For reasons explained its memorandum opinion of February 4, 2021, the district court rejected both arguments set forth in the motion. *See United States v. Ojedokun*, No. 8:19-cr-00228 (D. Md. Feb. 4, 2021), ECF No. 167 (the "Reconsideration Opinion").[4] Regarding the statute of limitations argument, the court determined that Ojedokun misread our opinion in *Smith* and that a § 1956(h) conspiracy charge is not required to allege the particular "specified unlawful activity" as an element of the offense. *Id.* at 12-13. That matter notwithstanding, the court concluded that the factual allegations in the Superseding Indictment did not "broaden or substantially amend" the allegations set out in the Original Indictment — but in fact "narrowed the scope of the conspiratorial conduct" — and that, as wire fraud and conspiracy to commit wire fraud are "similar in essence," any claimed

---

[4] The Reconsideration Opinion has been published and can be found at 517 F. Supp. 3d 444 (D. Md. 2021).

confusion on Ojedokun's part was "feigned." *Id.* at 14-17. Accordingly, the court ruled that the Superseding Indictment related back and was not untimely.

As to the extraterritoriality claim, the district court explained that § 1956(f) "explicitly overcomes the presumption against extraterritoriality" by "unambiguously stat[ing] the circumstances" when it affords extraterritorial effect. *See* Reconsideration Opinion 19-20. The court concluded that § 1956(f)(1) applied to Ojedokun's "conduct" abroad because, as the jury found, he "conspired with Ogundele, a Maryland [r]esident," and his conspiratorial conduct thus occurred "in part in the United States." *Id.* at 20-21.

Following its denial of the reconsideration motion, the district court convened for sentencing on March 11, 2021. The court sentenced Ojedokun to a term of 108 months of imprisonment. Ojedokun timely noted this appeal on that same date, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Ojedokun presents four issues to this Court for consideration on appeal, some based on arguments presented to the district court, and others for the first time. Specifically, Ojedokun has asked us to determine (1) whether the 18 U.S.C. § 1956(f) extraterritorial jurisdiction provision granted the district court subject matter jurisdiction to adjudicate the § 1956(h) money laundering conspiracy charge; (2) whether the Superseding Indictment was barred by the statute of limitations or could relate back to the Original Indictment; (3) whether the FBI agents' entry into his home contravened the Fourth Amendment, such that the district court's admission of the resultant evidence amounted to reversible plain

13

error; and (4) whether his trial counsel rendered ineffective assistance by failing to move to suppress his statements and the cell phone's contents because he did not grant valid consent for the FBI agents to enter his home. We address each of those contentions in turn.

A.

Ojedokun's principal argument in this proceeding is that § 1956(f) did not afford the district court extraterritorial jurisdiction to hear the § 1956(h) money laundering conspiracy charge growing out of his actions abroad. In advancing that claim, Ojedokun sets forth two separate contentions. First, he urges that the express terms of § 1956(f) do not overcome the presumption against extraterritoriality with respect to § 1956(h) conspiracy offenses, because a subsection (h) conspiracy is not "conduct" as subsection (f) conceives of that term and because such conspiracy offenses do not require a "transaction" as contemplated by § 1956(f)(2). Second, Ojedokun asserts that even if § 1956(f) applies to § 1956(h) conspiracies as a general matter, the provision cannot extend to cover his conspiratorial conduct in this case because his actions did not occur "in part in the United States" but instead exclusively in Nigeria.

We review de novo the district court's determination that it possessed extraterritorial jurisdiction over the conspiracy charge against Ojedokun. *See New Horizon of N.Y. LLC v. Jacobs*, 231 F.3d 143, 150 (4th Cir. 2000). The government contends that extraterritoriality presents a merits question under the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and that because Ojedokun raised his extraterritoriality argument for the first time in a post-verdict reconsideration motion, he forfeited the claim and it is reviewable only for plain error. *Morrison*, however,

14

considered whether § 10(b) of the Securities Exchange Act of 1934 *could* reach extraterritorial conduct. *See id.* at 250-54. Here, by contrast, § 1956(f) explicitly provides for extraterritorial jurisdiction; with it, Congress delimits federal courts' jurisdiction over foreign defendants involved in money laundering prosecutions. The statute provides for subject matter jurisdiction, the propriety of which may be attacked at any time; accordingly, our review of its application is plenary. *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314, 317 (S.D.N.Y. 2009) ("There are two provisions in the [money laundering] statute which undertake to establish subject matter jurisdiction where the defendant is foreign. One of these is § 1956(f) . . . .").

1.

Ojedokun did not argue in the district court, nor does he here, that § 1956(f) fails to overcome the presumption against extraterritoriality in any respect. Such an argument would undoubtedly fail, as the statute specifies that "[t]here is extraterritorial jurisdiction over . . . ." *See* 18 U.S.C. § 1956(f). Rather, Ojedokun's position is that the section cannot be interpreted to rebut the presumption as applied to § 1956(h) conspiracy offenses, largely because those offenses require nothing more than a "mere agreement" and therefore cannot constitute "*conduct* prohibited by this section" as envisioned by subsection (f). Subsections (f) and (h) again provide:

> (f)  There is extraterritorial jurisdiction over the conduct prohibited by this section if—
>
>    (1)  the conduct is by a United States citizen or, in the case of a non-United States Citizen, the conduct occurs in part in the United States; and

15

> (2)     the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.
>
> * * *
>
> (h)     Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

*See* 18 U.S.C. § 1956(f), (h).

Ojedokun is certainly correct that courts impose a presumption against the extraterritorial application of federal statutes absent a clear indication of contrary congressional intent. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *Morrison*, 561 U.S. at 255. The presumption against extraterritoriality is rooted in "the commonsense notion that Congress generally legislates with domestic concerns in mind." *See Smith v. United States*, 507 U.S. 197, 204 n.5 (1993). It is well established, however, that Congress may apply its laws beyond the shores of the United States, and the Supreme Court has said that the presumption against extraterritoriality may be overcome by an "affirmative and unmistakabl[e]" instruction that the statute at hand does in fact apply to foreign conduct. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (citing *Morrison*, 561 U.S. at 261). In *RJR Nabisco*, the Court provided us with a two-step framework for assessing questions of extraterritoriality. First, we must determine whether the presumption has been rebutted — "that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 2101. If the presumption stands, the second step inquires "whether the case involves a domestic application of the statute,"

16

which will occur where the conduct relevant to the "focus" of the statute occurred within the United States. *Id.*

At bottom, whether a statute should be given extraterritorial effect is a question of congressional intent, and in searching for such intent, courts may consider "all available evidence," to include "the text of the statute, the overall statutory scheme, and legislative history." *See In re French*, 440 F.3d 145, 151 (4th Cir. 2006) (citing *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993); *Smith*, 507 U.S. at 201-03 & n.4).[5] Put differently, the presumption against extraterritoriality should not be read as a clear statement rule; "the structure and history of the statute are also relevant" to the extraterritoriality analysis, and the statute's "context" may be "dispositive." *See Roe v. Howard*, 917 F.3d 229, 240 (4th Cir. 2019) (quoting *RJR Nabisco*, 136 S. Ct. at 2102-03).

Ojedokun is likewise correct that the presumption is not defeated simply by virtue of a statute's expressly addressing its extraterritorial application; rather, courts must closely consider "the *extent* of the statutory exception." *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455-56 (2007) (citing *Smith*, 507 U.S. at 204). As stated, there is no question here that § 1956(f) provides a "clear, affirmative indication that it applies

---

[5] The principles stated above, as espoused by this Court and by the Supreme Court, control the inquiry as to whether congressional intent indicates that a statute may apply in extraterritorial fashion. Ojedokun overreads the Supreme Court's rulings on the presumption against extraterritoriality in a way that casts the presumption in an all-but-insurmountable light. He insists that we must apply what he styles as the "highly demanding" "lingering doubt standard," a purported rule drawn from dictum in *Smith v. United States*, 607 U.S. 197, 203-04 (1993). Because we do not find the "lingering doubt" standard to be well established in Supreme Court precedent, we do not discuss it further.

17

extraterritorially." *See RJR Nabisco*, 136 S. Ct. at 2101. Ojedokun's particular assertion is that § 1956(f)'s extraterritorial reach cannot be read to extend to a money laundering conspiracy offense under § 1956(h).

a.

In seeking to show that § 1956(h) offenses lie outside the scope of § 1956(f)'s extraterritorial range, Ojedokun first relies on the fact that subsection (f) was enacted as part of the original MLCA in 1986, while subsection (h) was added six years later in 1992. Ojedokun observes that in 1986, § 1956 set out only substantive money laundering offenses — in Ojedokun's words, "offenses necessarily requiring *action*," *see* Br. of Appellant 16 — and made no mention of a conspiracy offense. Congress did not amend the language of § 1956(f) when it added § 1956(h) in 1992, nor did it do so when the Supreme Court held that § 1956(h) conspiracy offenses require only an agreement to be completed, not an overt act in furtherance of the conspiracy. *See Whitfield v. United States*, 543 U.S. 209, 214 (2005).[6] Ojedokun highlights that congressional inaction in the face of change as evidence of Congress's intent that "*conduct* prohibited by this section," as that phrase is used in subsection (f), should not be read to apply to a subsection (h) conspiracy, which requires no "act" in furtherance, but only an "agreement."

---

[6] This Court also held, prior to the Supreme Court's decision in *Whitfield*, that a § 1956(h) money laundering conspiracy offense does not include an overt act as an essential element. *See United States v. Bolden*, 325 F.3d 471, 491 (4th Cir. 2003) ("[Section] 1956(h) does not require an overt act to be either alleged or proven.").

18

That Congress added § 1956(h) to the MLCA after § 1956(f) does not by necessity mean that the earlier-enacted provision does not apply to the latter. To the contrary, Congress may well not have amended or otherwise updated subsection (f) because it understood that provision — as drafted in 1986 — already to be sufficiently broad to apply to *all* "conduct prohibited by" the totality of § 1956, to include conspiratorial agreements under § 1956(h). Traditionally, courts have hesitated to rely on legislative inaction as a reliable basis for statutory interpretation, though drawing inferences from such silence may be appropriate in certain circumstances. *See Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 170 (4th Cir. 1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993)). The theory of legislative inaction usually is applied in the context of Congress "acquiescing" to administrative or judicial interpretations of a statute, but may be said also to apply in the context of inaction in the face of subsequent statutory amendments. *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 599-600 (1983); *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988). In any event, an inference here that Congress's failure to amend § 1956(f) demonstrates its perception that subsection (f)'s original terms encompass subsection (h) conspiracy offenses is at least as strong as Ojedokun's argument to the contrary. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 ("Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction . . . ." (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962))). Moreover, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *See United States v. Price*, 361 U.S. 304, 332 (1960). Accordingly, we find Ojedokun's contention minimally persuasive at best.

19

Turning to the statute's text, Ojedokun next asserts that because a § 1956(h) conspiracy requires only a "mere agreement" after *Whitfield* with no "act" in furtherance necessary, the offense cannot amount to "conduct" under § 1956(f). With that being so, Ojedokun argues that § 1956(f) lacks a "clear, affirmative indication" that it rebuts the presumption against extraterritoriality as applied to subsection (h) offenses. Ojedokun's reasoning takes an exceedingly narrow view of the term "conduct" — that to enter into an agreement is not to engage in conduct, or to take an action. As support for his position, Ojedokun relies on § 1956's definition of the verb "conducts," which "includes initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. § 1956(c)(2). The verb "conducts" is operative as part of § 1956's substantive offenses, which may be completed when a person "conducts or attempts to conduct" a "financial transaction." *Id.* § 1956(a)(1). Ojedokun implies that the *noun* "conduct" as used in § 1956(f) should be read to carry that same definition, such that a conspiratorial agreement — which does not involve initiating or concluding a financial transaction — would not be "conduct." Section 1956, however, does not supply a definition of the noun "conduct," and Ojedokun's argument is therefore misplaced. Instead, the ordinary meaning of "conduct" must control: that is, "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal; the manner in which a person behaves; collectively, a person's deeds." *See Conduct*, *Black's Law Dictionary* (11th ed. 2009); *see also Conduct*, *New Oxford American Dictionary* (2d ed. 2005) ("the manner in which a person behaves, esp[ecially] on a particular occasion").

20

Ojedokun goes on to insist that even if the term "conduct" as it appears in § 1956(f) carries the "broader, dictionary-definition" of that term, "the conduct involved in a money-laundering conspiracy offense" — that is, a "mere agreement" — is "narrow enough arguably to fall outside that dictionary definition." *See* Br. of Appellant 16-17. We reject that argument out of hand, as it is plainly inconsistent with the well-established rules of conspiracy law. It is an axiomatic principle of the criminal law that thoughts alone may not be punished — every criminal offense must proscribe some conduct, some actus reus. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.1 (3d ed. 2020 update) ("Bad thoughts alone cannot constitute a crime; there must be an act . . . ."); Model Penal Code § 2.01(1) ("A person is not guilty of an offense unless his liability is based on *conduct* that includes a voluntary act . . . ." (emphasis added)).

Any agreement between two or more parties will, of course, require more than just a thought — some manner of concurrence with the proposal is needed. In these circumstances, as § 1956(h) conspiracy offenses require nothing more than an agreement to launder money, *see Whitfield*, 543 U.S. at 214, it follows that the agreement is necessarily the "conduct" making up the offense. The same can be said for other commonly charged conspiracy offenses not requiring an overt act for the crime to be complete, like the drug conspiracy statute, 21 U.S.C. § 846. *See United States v. Norman*, 935 F.3d 232, 237-38 (4th Cir. 2019). Indeed, the Supreme Court has explained that conspiracy offenses "do[] not punish mere thoughts; *the criminal agreement itself is the actus reus*." *See United States v. Shabani*, 513 U.S. 10, 16 (1994) (emphasis added) (holding that the government need not prove an overt act in furtherance to establish a violation of § 846); *see also Iannelli*

21

*v. United States*, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."). The action of agreement is the *sine qua non* of conspiracy, and in this respect, an agreement to commit money laundering is no different than one to commit any other unlawful act.

Because a conspiratorial agreement to launder money in contravention of § 1956(h) is conduct — that is, "behavior, whether by action or inaction, verbal or nonverbal," *see Conduct, Black's Law Dictionary* — we conclude that § 1956(f) sets out a "clear, affirmative indication" that it affords extraterritorial jurisdiction over § 1956(h) money laundering conspiracy charges. *See RJR Nabisco*, 136 S. Ct. at 2101; *accord United States v. Firtash*, 392 F. Supp. 3d 872, 886-87 (N.D. Ill. 2019) (resolving that charges alleging Austrian and Russian defendants conspired to transfer funds from abroad to U.S.-based financial institutions in contravention of § 1956(h) were within the extraterritorial reach of § 1956(f)); *United States v. Garcia*, 533 F. App'x 967, 982 (11th Cir. 2013) (concluding that "the requirements for extraterritorial jurisdiction were met" under § 1956(f) in affirming defendant's § 1956(h) conviction). On the whole, the "context" and "overall statutory scheme" of § 1956 support this determination. *See In re French*, 440 F.3d at 151; *Roe*, 917 F.3d at 240; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute."). Subsection (h) "prohibits" the "conduct" of conspiring — that is, agreeing — to launder money by subjecting a conspirator to the same penalties he would face for commission of § 1956's substantive offenses. The only logical conclusion, upon an examination of the statute, is that § 1956(f) overcomes the

22

presumption against exterritorial jurisdiction not only as applied to the substantive money laundering offenses, but also with respect to conspiracy offenses under § 1956(h).

b.

As an argument of last resort, Ojedokun points out that § 1956(f)(2) provides that extraterritorial jurisdiction will attach where "the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000." Turning once again to *Whitfield*'s holding that a § 1956(h) conspiracy offense requires only an agreement, Ojedokun maintains that because subsection (h) offenses need not involve any concrete "transaction," they are outside the scope of the extraterritoriality provision. But that contention, too, is unavailing. All that § 1956(f)(2) can be read to require is that a conspiracy to commit money laundering conceive of or relate to a transaction or series of related transactions exceeding $10,000 in value. Section 1956's substantive offenses require engaging in "a financial transaction," and so by necessity, a conspiracy to commit money laundering must anticipate laundering the proceeds of "specified unlawful activity" by way of "a financial transaction." So long as such transactions exceed $10,000 in value, extraterritorial jurisdiction is proper under subsection (f). Here, there is no dispute that the transactions intended to launder the proceeds of the dating website fraud scheme far exceeded $10,000. Accordingly, § 1956(f)'s requirement of a "transaction" is no bar to its

23

application to a § 1956(h) money laundering conspiracy offense and does not disturb our conclusion on that question.[7]

2.

Section 1956(f)(1) requires that "in the case of a non-United States citizen," the conduct over which extraterritorial jurisdiction is to be exerted must have "occur[ed] in part in the United States." Ojedokun, who was not a United States citizen when he engaged in the conduct at issue, contends that even if entering into a conspiratorial agreement constitutes "conduct" under § 1956(f), that provision cannot apply in this case because his actions occurred entirely overseas and he did not enter the United States at any time during the conspiracy. We find his argument unpersuasive.

It is uncontested that Ojedokun resided and worked exclusively in Nigeria for the duration of the money laundering conspiracy, whether it began in 2011 or 2013. Ojedokun makes much of that fact and returns once more to his reliance on *Whitfield*, declaring that because overt acts in the United States are not relevant to the charge against him and as his

---

[7] It should here be noted that the government advances a second theory as to why jurisdiction over the conspiracy charge was proper. It submits that the second step of the Supreme Court's extraterritoriality framework applies — namely whether, if a statute does *not* overcome the presumption against extraterritoriality, "the case involves a domestic application of the statute." *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). If the conduct that is the "focus" of the statute occurred in the United States, the case involves a "permissible domestic application." *Id.* The government suggests that we need not address the extraterritorial scope of § 1956(h) because the statute's "focus" — here, Ojedokun's conspiratorial agreement — occurred in the United States. Though that may be the case to an extent as addressed herein, because the *RJR Nabisco* framework instructs that a finding of extraterritoriality at step one "will obviate step two's 'focus' inquiry" and it is "preferable" to begin with step one, *see id.* at 2101 n.5, we decline to address whether this case presents a "permissible domestic application" of § 1956(h).

24

"mere agreement" with Ogundele, Haruna, and other coconspirators was entered into — if at all — from Nigeria, his pertinent "conduct" did not occur "in part in the United States." To bolster his argument, Ojedokun invokes what he terms "[t]he primary source of legislative history" accompanying the enactment of the MLCA, a Senate report on that statute. The report explained that it was "not the Committee's intention to impose a duty on foreign citizens operating wholly outside of the United States to become aware of U.S. laws." *See* S. Rep. No. 99-433, at 14 (1986). Ojedokun reiterates that he never set foot in this country during the course of the conspiracy, and as such insists he operated "wholly outside" of the United States at all relevant times. His argument misses the mark and misunderstands the way in which conspiracy offenses operate.

Ojedokun brings to our attention no cases demonstrating that the making of an agreement between coconspirators in the United States and their counterparts abroad does *not* occur, at least "in part," in the United States. In assessing where such a meeting of the minds "occurs," it is instructive to consider cases evaluating proper venue in a conspiracy prosecution. Although Ojedokun has correctly reminded us that venue is not the same as jurisdiction, venue rules endeavor to permit the prosecution of a crime only in the place where it occurred and can consequently shed light on where the intangible conduct of an "agreement" happens.

Venue in a criminal case "is proper only in a district in which an essential conduct element of the offense took place." *See United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006). As to where the "conduct element" of a conspiracy offense "takes place," we have explained that conspiracies operate "wherever the agreement was made or wherever any

25

overt act in furtherance of the conspiracy transpires," which may include a place where "the defendant has never set foot." *See United States v. Bowens*, 224 F.3d 302, 309, 311 n.4 (4th Cir. 2000) (citing *Hyde v. United States*, 225 U.S. 347, 356-67 (1912)); *see also United States v. Levy Auto Parts of Can.*, 787 F.2d 946, 952 (4th Cir. 1986); *accord Firtash*, 392 F. Supp. 3d at 886-87 (concluding that defendants charged under § 1956(h) for conspiring to transfer laundered funds from foreign accounts to banks in the United States engaged in conduct "in part in the United States," notwithstanding that the defendants never entered this country). The same holds for conspiracy offenses that do not include an overt act as an essential element: the Supreme Court has long held that venue in a conspiracy prosecution is proper "in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element." *See Whitfield*, 543 U.S. at 218 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 252 (1940)).[8] In these circumstances, the statutory venue provision in § 1956 is in accord with the above-stated principles, providing that venue in a § 1956(h) case may be had in any district where an act in furtherance of the conspiracy took place. *See id.* at 217-18; 18 U.S.C. § 1956(i)(2).

---

[8] That overt acts in furtherance can determine the geographic location of a conspiracy's operation — even where the particular offense does not require an overt act in order to be completed — is well established. *See United States v. Levy Auto Parts of Can.*, 787 F.2d 946, 951 (4th Cir. 1986) (explaining that although a 21 U.S.C. § 963 conspiracy offense does not require an act in furtherance of the conspiracy, "proof of overt acts [in a jurisdiction] discloses that the conspiracy had a presence [in that jurisdiction] and was alive and well at the time").

At bottom, conspiracies operate in a sweeping geographic sense, wherever the conspiratorial agreement is made as well as anywhere an overt act in furtherance takes place — even if a particular coconspirator never travels to such places. Such a broad presence flows from the agency relationship underpinning conspiracies, which dictates that what one conspirator does is attributed to all his associates. Here, Ojedokun agreed with multiple coconspirators to arrange financial transactions intended to disperse and disguise the proceeds of the U.S.-based fraud scheme, including by way of distributing wire transfer documents through Ojedokun's email accounts. Those conspiratorial agreements were made with, among others, Gbenga Benson Ogundele, a resident of the State of Maryland. Moreover, there were ample overt acts in furtherance of the conspiracy taken in the United States, including communications with fraud victims, purchases of goods with the fraud proceeds, and wire transfers intended to conceal the illicit source of the funds. Though it is clear that such overt acts are not pertinent to Ojedokun's culpability under § 1956(h), they are relevant in assessing whether the conspiracy took place at least "in part" in the United States. *See Whitfield*, 543 U.S. at 218.

Ojedokun's claim that his conspiratorial conduct did not occur "in part in the United States" is as such without merit. By making an agreement with at least one resident of the United States and engaging in a conspiracy extensively carried out in this country, he took part in a course of conduct relevant to the § 1956(h) charge that transpired within the United States, placing his actions squarely within the confines of § 1956(f)(1). To conclude, Ojedokun's extensive efforts to demonstrate that the district court lacked extraterritorial jurisdiction over the § 1956(h) charge are unpersuasive. Section 1956(f) clearly and

27

unambiguously extends the extraterritorial reach of § 1956 to conspiracy offenses under § 1956(h) and also applies on its own terms to Ojedokun's conduct in Nigeria. The district court did not err in so determining and was properly vested with subject matter jurisdiction over this case.

B.

The second issue presented by Ojedokun in this appeal is whether the district court erred in determining — multiple times — that the Superseding Indictment was timely returned. Ojedokun contends that the Superseding Indictment was untimely under the five-year limitations period set out at 18 U.S.C. § 3282(a) because it "substantially amended" the nature of the conspiracy charge in the Original Indictment, such that it could not relate back to the date of the Original. We review de novo the district court's conclusion of law that the statute of limitations did not bar the Superseding Indictment. *See United States v. Uribe-Rios*, 558 F.3d 347, 351 (4th Cir. 2009). In this instance, we agree with the district court's well-reasoned determination that the Superseding Indictment was not time-barred. *See* Reconsideration Opinion 3-18.

1.

The Original Indictment, returned on May 6, 2019, charged Ojedokun with a single count of conspiracy to launder money in contravention of 18 U.S.C. § 1956(h), alleging the conspiracy lasted from January 2011 until March 2015. That indictment identified "conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349" as the "specified unlawful activity" that the proceeds to be laundered derived from. *See* Original Indictment 2-3. Because the statutory list of offenses qualifying as "specified unlawful activity" for

28

purposes of § 1956 includes wire fraud but not wire fraud conspiracy, *see* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1), the government alleged in its Superseding Indictment of August 10, 2020, that the "specified unlawful activity" at issue in the instant conspiracy was "wire fraud in violation of 18 U.S.C. § 1343." *See* Superseding Indictment 3. The Superseding Indictment also alleged the conspiracy lasted only from 2013 to March 2015. Ojedokun challenged the timeliness of the Superseding Indictment three times before the district court. He averred there, as here, that the August 2020 Superseding Indictment (returned more than the permitted five years after the alleged end of the conspiracy) could not relate back to the May 2019 date of the Original Indictment because it impermissibly "broadened" or "amended" the scope of its predecessor by altering the cited "specified unlawful activity." *See* J.A. 233. That argument was rejected by the district court each time it was raised.

The return of an indictment tolls the statute of limitations on the charges contained in the indictment, and "a superseding indictment which supplants a timely-filed indictment, still pending, is itself to be regarded as timely . . . so long as it neither materially broadens nor substantially amends the charges against the defendant." *See United States v. O'Bryant*, 998 F.2d 21, 23 (1st Cir. 1993). That is, such an indictment relates back to the date of the original indictment "so long as a strong chain of continuity links the earlier and later charges." *See id.* at 24; *see also United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985). Ojedokun advocates that the "key question" in assessing whether a superseding indictment "materially broadens or substantially amends" its predecessor is whether an element of the charged offense is modified in the later indictment. *See* Br. of Appellant

29

26. Our sister circuit courts of appeals, however, have aptly explained that a broader consideration of whether the defendant is put on sufficient notice of the charges against him is central to the inquiry. *See, e.g.*, *United States v. Grady*, 544 F.2d 598, 601-02 (2d Cir. 1976); *United States v. McMillan*, 600 F.3d 434, 444 (5th Cir. 2010); *United States v. Farias*, 836 F.3d 1315, 1324 (11th Cir. 2016).[9]

In determining whether a superseding indictment may relate back to the time of an earlier indictment, courts consider whether the new charges "allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." *See United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003). No factor alone is dispositive, however, as the "touchstone" of the analysis is "whether the original indictment fairly alerted the defendant to the subsequent charges against him." *See id.* That is, the relation-back inquiry focuses not strictly on "the statutes under which the defendant was charged," *see United States v. Ratcliff*, 245 F.3d 1246, 1253 (11th Cir. 2001), but primarily on "whether approximately the same facts were used as the basis of both indictments," *see United States v. Italiano*, 894 F.2d 1280, 1285 (11th Cir.

---

[9] Ojedokun also asserts as part of his relation-back argument that the Superseding Indictment may not relate back because the Original Indictment was "defective" by virtue of failing to allege a qualifying "specified unlawful activity." That contention is without merit, as courts have held that superseding indictments may relate back to predecessors failing to identify "a valid overt act," a nonviable theory of fraud, and the like, provided the original indictment contained sufficient factual allegations to put the defendant on notice of the later charges against him. *See, e.g.*, *United States v. W.R. Grace*, 504 F.3d 745, 752 (9th Cir. 2007); *United States v. Italiano*, 894 F.2d 1280, 1283-86 (11th Cir. 1990). As explained herein, the Original Indictment afforded such notice in this matter, and accordingly the Original's failure to identify a sufficient "specified unlawful activity" did not preclude it from tolling the five-year statute of limitations.

1990).  Those principles are grounded in due process and seek to ensure that defendants are afforded "timely notice . . . that they will be called to account for their activities and should prepare a defense."  *See Grady*, 544 F.2d at 601.  If a comparison of an original and a superseding indictment reveals that the former failed to supply the defendant notice of the substance of the charges set forth in the latter, the subsequent indictment may not relate back to the original.  *See Italiano*, 894 F.2d at 1282-83.

2.

On appeal, Ojedokun's relation-back argument functions as follows:  the matter of whether a superseding indictment "substantially amends" an earlier indictment principally turns on whether an element of the charged offense is modified.  In the context of a money laundering conspiracy charge, Ojedokun contends that the government must identify the particular predicate offense qualifying as the "specified unlawful activity" required for the commission of § 1956(a)(1)'s substantive money laundering offenses.  That is, identifying the name or citation of the alleged specified unlawful activity is an "essential element" of a § 1956(h) conspiracy charge.  With that being the case, changing the offense alleged to constitute the specified unlawful activity in a superseding indictment — as occurred here — would "substantially amend" the scope of the original indictment, such that the later indictment could not relate back to the date of the earlier version.

We reject that line of reasoning on a number of grounds.  First, as noted, Ojedokun misstates the relevant legal standards controlling the relation-back inquiry, giving short shrift to the broader due process and notice concerns while focusing instead on "elements."  Second, in support for his claim that identifying the offense constituting "specified

31

unlawful activity" is an essential element of a § 1956(h) charge, Ojedokun relies only on the "necessary implication" of our decisions in *United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995), and *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003). His reliance on those cases is misplaced, and he cites no authority directly supporting his proposition.

*Smith* concerned a challenge to a substantive money laundering charge under 18 U.S.C. § 1957(a). There, the defendant submitted that the charges against him were deficient because they alleged the laundered funds at issue "were the proceeds of a wire fraud, in violation of 18 U.S.C. § 1343," without supplying details of that wire fraud. The charges therefore failed — according to the defendant — to allege "a necessary element of the offense of money laundering," namely that the involved money be "derived from specified unlawful activity." *See* 44 F.3d at 1263. We concluded in *Smith* that

> Just because the statute requires that funds be obtained from "specified" unlawful activity does not mean that the government is required to detail the circumstances of the unlawful activity. . . . Count 9 of Smith's indictment alleged not only that proceeds were derived from specified unlawful activity, but that the activity violated 18 U.S.C § 1343, which penalizes wire fraud. Nothing more need be alleged.

*Id.* at 1265.

Ojedokun focuses on *Smith*'s use of "nothing more need be alleged," insisting that "'nothing more' . . . necessarily implies 'but nothing less.'" *See* Br. of Appellant 28. That is, he reads *Smith* to require a statutory citation for a properly stated money laundering charge, whether substantive or conspiratorial, without which the charge will be defective. *Smith*, however, held only that a direct citation is sufficient for alleging "specified unlawful activity" — not that such a citation is necessary. That decision explained that the

32

indictment's provision of a citation will suffice to grant the defendant notice of the wrongful conduct he is charged with involvement in, and that no further factual details are required because "the requirement that the funds be illegally derived . . . does not lie at the core of the offense." *See* 44 F.3d at 1264-65. *Smith* did not go further to conclude that a statutory citation for the "specified unlawful activity" is a foundational or critical part of a substantive money laundering charge, let alone a money laundering conspiracy charge. And in this case, under *Smith*'s standard, the details set forth in both the Original and Superseding Indictments relating to the dating website fraud scheme surely were sufficient to afford Ojedokun notice of the purported wrongs underlying his conspiracy offense. In brief, Ojedokun's reliance on and interpretation of *Smith* are inappropriate.

Ojedokun's reliance on *Bolden* is likewise misplaced. There, we determined a § 1956(h) conspiracy charge adequately identified the "specified unlawful activity" underpinning the offense because, although it did not directly cite a statutory offense constituting that activity, it set out detailed factual allegations pertaining to a Medicaid fraud scheme that the defendants organized. *See* 325 F.3d at 491-92. Accordingly, we concluded that the charge put the defendants on "ample notice of the details of the specified unlawful activity" generating the proceeds at hand, just as occurred in this proceeding. *Id.* at 492.

For its part, the district court capably dispensed with Ojedokun's arguments, looking to our decisions in *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008), and *United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010), both of which spelled out the elements the government is obliged to prove in a § 1956(h) prosecution without any mention of

33

pleading a particular "unlawful activity." *See* Reconsideration Opinion 8-9. The court resolved that *Smith*, unlike *Singh* and *Green*, did not purport to "squarely address" the elements of a § 1956(h) offense, and therefore concluded that the specific unlawful activity underlying a money laundering charge is not an essential element that must be pleaded and proved. *Id.* at 12-13.

3.

Ultimately, we need not decide whether an indictment must allege, as an element of a § 1956(h) charge, a particular statutory offense constituting "specified unlawful activity." This is so because our consideration of whether the Superseding Indictment "substantially amended" the Original Indictment is not confined to considering elements of the charged offense, but must instead take stock of the larger context of what each indictment alleged and whether the substance of the first "fairly alerted the defendant to the subsequent charges" outlined in the second. *See Salmonese*, 352 F.3d at 622. We conclude there can be no doubt that the factual allegations recited in the Original Indictment afforded Ojedokun more than sufficient notice of what he was accused of in the Superseding Indictment, which departed from the Original largely by changing the phrase "conspiracy to commit wire fraud" to "wire fraud." That is, the Superseding Indictment barely amended its predecessor at all, let alone "substantially," and such would be the case even if a particular statutory offense constituting "specified unlawful activity" were held to be an essential element of a § 1956(h) conspiracy charge.

Our conclusion is supported by assessing what appears on the face of the separate indictments. The government modified the offense qualifying as the "specified unlawful

34

activity" in the Superseding Indictment, but both indictments ultimately charged Ojedokun with the same crime: conspiracy to launder money in contravention of 18 U.S.C. § 1956(h). Moreover, the Superseding Indictment's factual allegations pertaining to both the wire fraud scheme and the money laundering conspiracy were drawn nearly word-for-word from the Original Indictment. Both described the inner workings of the "internet-based romance scam" and the communications utilized in defrauding the coconspirators' victims. *See* Original Indictment 2; Superseding Indictment 2. The indictments mutually alleged Ojedokun conspired with Haruna and Ogundele to knowingly commit promotion and concealment money laundering. *See* Original Indictment 2-3; Superseding Indictment 3. Both maintained that Ojedokun's coconspirators managed certain "drop accounts," including a particular Wells Fargo account owned by Ogundele, to receive millions of dollars from the fraud victims; that the coconspirators used wire transfers and other conveyances to conceal the "nature, source, and control" of the proceeds; and that Ojedokun would send and receive emails evidencing the deposits made by the fraud victims. *See* Original Indictment 1-4; Superseding Indictment 1-2, 4. The Superseding Indictment did include new allegations that the coconspirators transmitted images of wire transfer forms and certain victim identity information, but those details only served to supplement the preexisting allegations and cannot be said to have altered the nature of the offense with which Ojedokun was charged.

Consequently, the only material differences between the two indictments were the modified statutory citations and the narrowed allegation of the conspiracy's timeline. Those changes did not "materially broaden or substantially amend" the scope of the

35

Original Indictment.  Altering the predicate offense of "conspiracy to commit wire fraud" to the closely related crime of "wire fraud" was, at worst, only a "trivial or innocuous" change, which we have said will not bar a superseding indictment from relating back to an earlier version.  *See Snowden*, 770 F.2d at 398.  In his arguments before the district court and this Court, Ojedokun appears to allege that he was not adequately advised of the Superseding Indictment's charges before the date of its return, and that the modifications in that document prejudiced his ability to prepare a robust defense.  We cannot agree, and we adopt the district court's conclusion that Ojedokun's supposed confusion was feigned.  *See* Reconsideration Opinion 16.  The Original Indictment afforded Ojedokun notice of the ultimate charges against him, and because such notice is the "touchstone" of the relation-back inquiry, *see Salmonese*, 352 F.3d at 622, we affirm the district court's determination that the Superseding Indictment related back to the date of the Original and was not barred by the statute of limitations.

## C.

The remaining two contentions put forward by Ojedokun were not presented to the district court, and both grow out of his interview by the FBI in April 2019.  First, Ojedokun asserts that the FBI agents violated the Fourth Amendment when they entered his home in Chicago — either by reason of involuntary consent to enter or because the agents exceeded the scope of Ojedokun's consent — and that the district court's admission of the resultant evidence was accordingly reversible plain error.  Second, Ojedokun alleges his trial counsel rendered constitutionally ineffective assistance as defined by the Sixth Amendment by failing to move to suppress the FBI's evidence on the aforementioned Fourth Amendment

36

grounds. We conclude that Ojedokun's Fourth Amendment claim lacks merit and decline to reach the ineffective assistance claim raised for the first time on direct appeal.

1.

Relative to the Fourth Amendment claim, the government maintains that Ojedokun has waived his theory by failing to raise it before the district court and that we may not consider it. Ojedokun filed three pre-trial motions to suppress, all denied by the district court, submitting that his statements during the FBI interview and the evidence from his cell phone should be excluded because (1) he was in custody and not properly Mirandized; (2) his statements were involuntarily given; (3) he had not given voluntary consent to the search of the cell phone; and (4) a search warrant for his email accounts was issued in the absence of probable cause. Ojedokun now contends that the same evidence should have been suppressed as fruit of the poisonous tree because (1) the consent he gave to the FBI agents to enter his home was invalid and (2) even if the consent was valid, the agents exceeded the scope of the consent, all in contravention of the Fourth Amendment.[10]

A defendant must generally raise a motion to suppress before trial. *See* Fed. R. Crim. P. 12(b)(3)(C). Otherwise, such a motion is untimely, and the district court may not consider it unless the defendant shows "good cause." *See* Fed. R. Crim. P. 12(c)(3). If the defendant is unable to show good cause, the untimely motion to suppress is waived. *See*

---

[10] We pause to make clear that the Fourth Amendment claims raised by Ojedokun in the district court pertained to the search of his cell phone, and not the FBI agents' entry into his home. Accordingly, the present claim contesting the validity and scope of Ojedokun's consent for the agents to enter was not preserved for appeal.

*United States v. Moore*, 769 F.3d 264, 267 (4th Cir. 2014). When a defendant does file a motion to suppress before trial, however, and simply raises distinct suppression arguments later — including on appeal, as here — we have found those arguments only forfeited and have reviewed the district court's admission of evidence for plain error. *See, e.g.*, *United States v. Rumley*, 588 F.3d 202, 205 & n.1 (4th Cir. 2009); *United States v. Perrin*, 45 F.3d 869, 875 (4th Cir. 1995). Accordingly, we review the district court's admission into evidence of Ojedokun's statements to the FBI and the information from his cell phone for plain error. *See* Fed. R. Crim. P. 52(b). "To prevail on plain error review, an appellant must show (1) that the district court erred, (2) that the error was plain, and (3) that the error affected his substantial rights." *See United States v. Cohen*, 888 F.3d 667, 685 (4th Cir. 2018). A plain error affects the defendant's substantial rights if it was "prejudicial," in that there is "a reasonable probability that the error affected the outcome of the trial." *See United States v. Marcus*, 560 U.S. 258, 262 (2010).

The Fourth Amendment bars police from making a "warrantless and nonconsensual entry" into an individual's home in order to effect a "routine felony arrest." *See Payton v. New York*, 445 U.S. 573, 576 (1980). Consent to a search or for entry into one's home must be "knowing and voluntary." *See United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007). The question of "whether consent to a search is voluntary — as distinct from being the product of duress or coercion, express or implied — is one 'of fact to be determined from the totality of all the circumstances.'" *See United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

38

The district court made no direct factual determination as to the voluntariness of Ojedokun's consent for the agents to enter his home, but it did find that the agents "were invited in" and "were given permission to come in," that they explained the nature of their questioning, and that Ojedokun was sufficiently intelligent to understand their requests. *See* J.A. 157-59. Indeed, the agents asked Ojedokun, "[C]an we go in?," to which Ojedokun replied — not for the first time — "[O]kay." *Id.* at 1114. The record does not reveal that the agents made any misrepresentations, operated under false pretenses, or otherwise obtained Ojedokun's consent to go inside the home under "duress or coercion." Ojedokun makes repeated reference to the fact that he was "a Nigerian citizen present in the United States for only two years" and that the agents arrived at his home at 8:00 a.m., *see* Br. of Appellant 14, 33, 36, but those circumstances do not obviate his voluntary grant of consent (and further, the evident attempt to call into question Ojedokun's intelligence brushes over the fact that he was then a Ph.D. student in chemistry). Ojedokun surely realized the agents intended to ask him more than "a couple" of questions by asking to come inside, and they assured him once there that the interview was "completely voluntary." *See* J.A. 1114, 1116. All told, an insufficient basis exists for finding Ojedokun's consent was involuntary.

When there is "no question that consent was voluntary," the scope of that consent is assessed by considering what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *See United States v. Coleman*, 588 F.3d 816, 819 (4th Cir. 2009) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Here, the agents requested Ojedokun's permission to enter his home to ask him questions about

39

his time in Nigeria. Ojedokun focuses on the agents' request to ask "a few" questions, claiming they "vastly exceeded the scope of the limited consent" given by asking more than two or three questions. *See* Br. of Appellant 37. Again, Ojedokun, like any reasonable person under the circumstances presented, surely understood the officers did not want to come into his home and sit down to ask "two or three" questions. The agents cannot be said to have gone beyond the confines of Ojedokun's consent.

Ojedokun spends ample time explaining how the government's evidence of his incriminating statements and the information seized from his cell phone were central to its case, such that the district court's supposed error in admitting that evidence prejudiced him. The government disputes Ojedokun's prejudice characterization, but the disagreement is of no moment because Ojedokun cannot demonstrate plain error on the district court's part. It may well be the case that the evidence in question prejudiced Ojedokun at trial, but there is no demonstrated error in the Fourth Amendment context with respect to the court's decision to admit the evidence. The record suggests that Ojedokun's consent for the agents to enter his home was fully voluntary and that the agents remained within the scope of that consent. As such, the district court did not commit plain error by admitting the evidence obtained from the 2019 interview.

## 2.

Finally, we decline to consider Ojedokun's ineffective assistance of counsel claim, which avers that his trial counsel "inexplicably failed" to move to suppress the evidence from the FBI interview on the above-considered Fourth Amendment theory. *See* Br. of Appellant 48. In this Circuit, a defendant may raise an ineffective assistance claim for the

first time on direct appeal "only where the ineffectiveness 'conclusively appears' from the record." *See United States v. Russell*, 221 F.3d 615, 619 n.5 (4th Cir. 2000) (quoting *United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995)). Otherwise, the claim should be raised in a collateral proceeding by way of a 28 U.S.C. § 2255 motion. *See id.*; *see also United States v. Fisher*, 477 F.2d 300, 302 (4th Cir. 1973). Given the foregoing, the record here does not "conclusively" establish that Ojedokun's trial counsel provided constitutionally ineffective assistance. A reasonable and competent attorney could well have concluded that Ojedokun's consent-based Fourth Amendment suppression argument was meritless and would have failed. Accordingly, we need not address Ojedokun's Sixth Amendment claim any further in this proceeding.

## III.

Pursuant to the foregoing, we reject Ojedokun's appellate contentions and affirm the judgment of the district court.

*AFFIRMED*