**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 23-4013**

———————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANDRE RICARDO BRISCOE, a/k/a Poo,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:20-cr-00139-RDB-1)

———————————

Argued:  March 22, 2024                                    Decided:  April 30, 2024

———————————

Before WILKINSON and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————————

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Wilkinson and Judge Floyd joined.

———————————

**ARGUED:**  Marc Gregory Hall, LAW OFFICE OF MARC G. HALL, P.C., Greenbelt, Maryland, for Appellant.  Spencer Todd, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Erek L. Barron, United States Attorney, Paul E. Budlow, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

THACKER, Circuit Judge:

Andre Ricardo Briscoe ("Appellant") was involved in the purchase and sale of narcotics in the Baltimore area. He learned from a contact, Kiara Haynes, that Jennifer Jeffrey had received a large supply of heroin. Appellant and Haynes decided to rob Jeffrey. Appellant went to Jeffrey's house, robbed her of at least 80 grams of narcotics, shot and killed her, and shot and killed her seven year old son, K.B., whom Appellant feared might testify against him.

Appellant was arrested on a criminal complaint and initially charged by information with possession with intent to distribute narcotics, conspiracy to distribute narcotics, and possessing a firearm as a convicted felon. A later superseding indictment added three new counts: two counts of murder with a firearm during the commission of a drug trafficking crime and one count of killing a witness to prevent communication with law enforcement. After a twelve day jury trial, Appellant was convicted on all charges.

Appellant now appeals his judgment of conviction on five bases. First, he argues that three of his charges were barred by the statute of limitations. Second, he argues that his Fourth Amendment rights were violated when police used a cell site simulator to determine his location, searched the apartment in which he was found, and searched his person. Third, he argues that the Government committed a *Brady*[1] violation by failing to

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

2

investigate whether a broken security camera found in the kitchen of the murder victims had recorded any footage from the time of the murder. Fourth, he argues that the Government used perjured testimony at trial. And fifth, he argues that the district court should have granted his Rule 29 motion for a judgment of acquittal based upon the insufficiency of the evidence.

As detailed below, each of these five contentions lacks merit. Therefore, we affirm.

## I.

### A.

Appellant participated in a narcotics distribution conspiracy in the Baltimore area between March 2015 and October 2015. His co-conspirators were Haynes, Jeffrey, and Tony Harris. Their ultimate source for narcotics, which they believed to be heroin, was Curtis Williams, Jeffrey's housemate. Jeffrey and Williams supplied drugs to Harris, who, in turn, supplied drugs to Appellant. Appellant's cousin, Wane Briscoe, testified at trial that Appellant asked him to help Appellant sell heroin, and Appellant's uncle, Alfred Harris, testified that he knew Appellant was selling heroin because he tried Appellant's product and, as a longtime heroin user, he recognized its appearance and effects.

### B.

In May 2015, Williams was arrested and detained for possession with intent to distribute cocaine. In a recorded jail call, he directed Jeffrey to retrieve 80 grams of narcotics and sell them to Appellant in order to raise money for Williams' bail. When Appellant learned that Jeffrey had acquired these drugs, he decided to rob Jeffrey and kill her. Haynes was also in on the plan. Haynes helped Appellant obtain a .45 caliber firearm

3

on May 26, 2015, in a transaction brokered by Haynes's nephew.[2]  That night, Appellant

visited Jeffrey at her home, where she showed him the 80 grams of narcotics.

Shortly before noon the next day, Appellant returned to Jeffrey's house and robbed

her of at least 80 grams of narcotics.  He then murdered her, shooting her multiple times,

and then went upstairs to murder her seven year old son, K.B., whom he also shot multiple

times in the head and neck.  He later told several witnesses about the robbery and the

murders.  And he told them he had killed K.B. because he feared the boy would testify

against him.

C.

On May 28, Jeffrey's brother discovered the bodies of Jeffrey and K.B.  Baltimore

City Police homicide detectives responded to the scene and opened an investigation into

the murders.  They found a flip phone that belonged to Jeffrey and discovered that the last

dialed call, placed one day before the murders, was to a number ending in -2413.  That

number belonged to Appellant.

The investigators obtained a tracking order[3] from the Circuit Court for Baltimore

City to identify, among other things, cell site location information connected to Appellant's

---

[2] Because the nephew was incarcerated at the time, this arrangement was documented on a recorded jail call.

[3] A tracking order is an order issued by a judicial officer, pursuant to Maryland law, which authorizes investigators to use location data to identify the present location of a cell phone. Md. Code Ann., Crim. Proc. § 1-203.1(b)(1)(ii) ("A court may issue an order authorizing . . . a law enforcement officer to use a cell site simulator or obtain location information from an electronic device after determining from [an application prescribed by (Continued)

4

phone. Using this information, on June 5, 2015, they pinged Appellant's phone using a cell site simulator,[4] which led them to an apartment building. Investigators then obtained a warrant to search apartment 101 because the cell site data was directing them to that unit. After unsuccessfully searching apartment 101, the officers continued to receive cell site data indicating that Appellant's phone was nearby. Thus, the officers went to the second floor where they attempted, but failed, to enter apartment 201. They then knocked on the door of apartment 202, the unit where Appellant was ultimately located. The occupant who opened the door of apartment 202 allowed them to enter.

Once inside apartment 202, the officers secured Appellant and his cell phone and conducted a protective sweep of the apartment. They discovered narcotics and drug paraphernalia in a bedroom and brought everyone in the apartment, including Appellant, to the police department for questioning. Appellant was charged with narcotics possession, but the charges were later dropped, and Appellant was released from detention on October 7, 2015.

## D.

Federal investigators opened an investigation into Jeffrey and K.B.'s murders. Though Appellant was not initially charged with the murders, as a result of the investigation, Appellant was arrested on May 22, 2020, for drug charges and possessing a

---

the statute] that there is probable cause to believe" that the information sought is evidence of a crime or will lead to evidence of a crime.).

[4] A cell site simulator is a device that can track a cell phone's real time location by mimicking a cell tower.

5

firearm as a convicted felon. The Government filed a criminal information on May 26, 2020, charging Appellant with conspiracy to distribute narcotics, possession with intent to distribute narcotics, and possession of a firearm by a convicted felon. Appellant did not waive indictment, but the Government could not indict Appellant at that time because the District of Maryland had suspended grand jury proceedings in light of the COVID-19 pandemic.

Appellant was ultimately indicted on July 1, 2020, when grand jury proceedings resumed. The indictment was nearly identical to the information apart from alleging a different end date to the facts underlying the conspiracy charge. Appellant moved to dismiss the indictment as barred by the statute of limitations. The district court denied that motion, concluding that the indictment related back to the earlier filed information.

On September 23, 2020, the Government filed a superseding indictment which added three new charges: two counts of causing murder with the use of a firearm during and in relation to a drug trafficking crime and crime of violence (for the deaths of Jeffrey and K.B.), and one count of killing a witness to prevent communication with law enforcement. The Government filed a second superseding indictment on June 23, 2021, to add Haynes as a co-defendant, and filed a third superseding indictment (the operative indictment) on December 8, 2021, which added two counts of murder and one count of killing a witness to prevent communication with law enforcement.

The operative indictment alleged six counts: (1) conspiracy to distribute and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute controlled substances, in violation of 21

6

U.S.C. § 841(a)(1); (3) possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1); (4) use and carry of a firearm during and in relation to a drug trafficking crime and crime of violence, causing the murder of Jennifer Jeffrey, in violation of 18 U.S.C. § 924(j)(1); (5) use and carry of a firearm during and in relation to a drug trafficking crime and crime of violence, causing the murder of K.B., in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 3559(c)(2)(F), (d) and (f); and (6) killing a witness, K.B., to prevent communication to law enforcement, in violation of 18 U.S.C. § 1512(a)(1)(C) and (a)(3)(A) and 18 U.S.C. § 3559(c)(2)(F), (d) and (f).

E.

On June 8, 2022, after a twelve day trial, a jury found Appellant guilty on all counts. In special findings,[5] the jury found that Appellant, being 18 years of age or older, intentionally killed K.B., a child under the age of 14 years. On January 1, 2023, the district court sentenced Appellant to 480 months as to Count One and 480 months as to Count Two (the drug charges), and 120 months as to Count Three (the firearm possession charge). The court sentenced Appellant to life imprisonment as to Counts Four, Five, and Six consistent with the special findings. The special findings equated to a life sentence because 18 U.S.C.

---

[5] Special findings are specific questions of fact submitted to the jury for resolution. A jury may be asked to make special findings when, as here, the circumstances triggering enhanced punishment "'had to be pled in the indictment and the facts supporting those enhancements found by the jury beyond a reasonable doubt.'" *United States v. Udeozor*, 515 F.3d 260, 271 (4th Cir. 2008) (quoting *United States v. Robinson*, 213 F. App'x 221, 223 (4th Cir. 2007)); *United States v. Hedgepeth*, 434 F.3d 609, 613 (3d Cir. 2006) (noting that special findings may be necessary when a determination of certain facts will be crucial to the sentence).

§ 3559(c)(2)(F), (d), and (f), require a mandatory sentence of "imprisonment for life" if a defendant commits "a serious violent felony," such as murder, against a victim under 14 years old and the victim dies as a result.

Appellant timely appealed.

## II.

There are five issues in this appeal. First, Appellant argues that the charges against him should have been dismissed because his indictment was filed after the statute of limitations had run. Second, Appellant argues his Fourth Amendment rights were violated when police used a cell site simulator to determine his location, searched the apartment in which he was found, and searched his person. Third, Appellant argues the Government committed a *Brady* violation by failing to comprehensively investigate whether a broken video camera in the kitchen of the murder victims had recorded any footage from the time of the murder. Fourth, Appellant argues the Government used perjured testimony of three witnesses in securing a guilty verdict. Fifth, Appellant argues the district court erred when it denied his Rule 29 motion for a judgment of acquittal based upon the insufficiency of the evidence.

We address each issue in turn.

## A.

### Statute of Limitations

Appellant contends his indictment should have been dismissed because it was filed after the statute of limitations had run. Appellant moved to dismiss his indictment below, but the district court denied his motion, holding that the indictment related back to a timely

instituted information, which satisfied the statute of limitations. We review *de novo* the question of whether the district court properly denied Appellant's motion to dismiss. *United States v. Ojedokun*, 16 F.4th 1091, 1108 (4th Cir. 2021).

Pursuant to Federal Rule of Criminal Procedure 7(b), an "offense punishable by imprisonment for more than one year may be prosecuted by information if the defendant—in open court and after being advised of the nature of the change and of the defendant's rights—waives prosecution by indictment." Fed. R. Crim. P. 7(b). Appellant did not waive prosecution by indictment, and his crimes were punishable by imprisonment for more than one year. Thus, the Government was required to timely indict Appellant.

The statute of limitations is five years. It is undisputed that this window is established by 18 U.S.C. § 3282(a), which provides, "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."[6]

"[S]tatutes of limitations normally begin to run when the crime is complete." *Toussie v. United States*, 397 U.S. 112, 115 (1970). The information filed against Appellant on May 26, 2020 alleged conspiracy to distribute controlled substances beginning on April 20, 2015, possession with intent to distribute on May 27, 2015, and

---

[6] The only charges that are arguably at issue for purposes of this argument are Counts One, Two, and Three, the narcotics and firearm offenses; the other Counts, Four, Five, and Six are potential capital offenses, which are not governed by 18 U.S.C. § 3282(a).

felon in possession of a firearm.  And on July 1, 2020, a grand jury returned an indictment against Appellant, effectively realleging the charges contained in the information.

Given that the latest date of alleged conduct in connection with the drug and firearm charges was May 27, 2015, Appellant contends the statute of limitations ran five years later on May 27, 2020, and that the original indictment filed on July 1 was, therefore, untimely. While the Government acknowledges that the indictment was filed *after* the statute of limitations had run, it emphasizes that the information was filed *before* the statute of limitations had run.  The Government argues the indictment related back to the information, thereby making the indictment timely.  Accordingly, we must determine whether (1) filing the information tolled the statute of limitations and (2) whether the indictment related back to the information.

The second issue is not disputed.  Appellant does not contest that the indictment substantially realleges what was contained in the information.  Regarding successive indictments, we have held a later "indictment relates back to the date of the original indictment 'so long as a strong chain of continuity links the earlier and later charges.'" *Ojedokun*, 16 F.4th at 1109 (quoting *United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985)).  And, although we have not yet addressed the issue with respect to indictments following an information, other circuits have held that, when an indictment simply realleges what is contained in an information, it is "timely since it relate[s] back to the earlier [i]nformation." *United States v. Avery*, 747 F. App'x 482, 484 (9th Cir. 2018); *see also United States v. Saussy*, 802 F.2d 849, 852 (6th Cir. 1986) ("We can discern no

10

principled reason why, if an indictment relates back to an earlier filed indictment, a subsequently filed indictment should not relate back to an earlier filed information.").

The governing statute provides that a defendant is timely charged when an information is "instituted" within five years. 18 U.S.C. § 3282. Given that Appellant does not contest the substantive continuity between the information and the indictment, here the question is whether filing the information is equivalent to the statutory requirement of "institut[ing]" the information so as to pass statute of limitations muster. 18 U.S.C. § 3282(a). On that question, we agree with the district court. The Government satisfied the five year statute of limitations by filing an information on May 26, 2020.

We read the word "institute" according to its plain meaning, which, if it is unambiguous, controls our interpretation of the statute. *Espinal-Andrades v. Holder*, 777 F.3d 163, 166–67 (4th Cir. 2015). The plain meaning of the word "institute" is "[t]o set in operation, set on foot, initiate, 'start' (a search inquiry, comparison, etc.)." *Institute*, Oxford English Dictionary, https://perma.cc/2RLY-UQNR (last visited Apr. 12, 2024). "Institute" also means "to originate and get established : set up : cause to come into existence : . . . to set on foot." *Institute*, Merriam-Webster's Unabridged Dictionary, https://perma.cc/KJD3-5A24 (last visited Apr. 12, 2024). Filing an information unambiguously fits this definition of "instituting" an information because filing sets it on foot and brings it into existence.

Reading 18 U.S.C. § 3282 in this way comports with its purpose. Statutes of limitations are designed to "limit exposure to criminal prosecution following an illegal act . . . 'when the basic facts may have become obscured by the passage of time.'" *United*

11

*States v. Smith*, 373 F.3d 561, 563 (4th Cir. 2004) (quoting *Toussie*, 397 U.S. at 114). A charging document comports with that purpose when it puts a defendant on notice of the crimes charged within the period designated by the statute. *Saussy*, 802 F.2d at 852 ("The concerns generally underlying statutes of limitations have to do with placing a defendant on notice of the charges brought against him before those charges are presumptively stale."). Thus, in the context of superseding indictments, we have called notice the "'touchstone' of the relation-back inquiry." *Ojedokun*, 16 F.4th at 1112 (quoting *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003)); *see also United States v. Liu*, 731 F.3d 982, 997 (9th Cir. 2013) ("The central concern in determining whether the counts in a superseding indictment should be tolled based on similar counts included in the earlier indictment is notice."). We see no reason why a timely filed information cannot serve the same purpose when, as here, an information puts a defendant on notice of the charges and the subsequent indictment substantially realleges those charges.

The other circuits that have addressed this issue agree that filing an information is the same as instituting one. *United States v. Burdix-Dana*, 149 F.3d 741, 743 (7th Cir. 1998) ("[T]he filing of the information is sufficient to 'institute' it within the meaning of 18 U.S.C. § 3282."); *accord United States v. Cooper*, 956 F.2d 960, 962–63 (10th Cir. 1992) ("[T]he information could have been filed within the period of limitations, thus providing a valid basis for the prosecution."); *see also Ragland v. United States*, 756 F.3d 597, 600–01 (8th Cir. 2014) (noting the prevailing authorities on this issue but declining to decide it).

12

Thus, we hold the Government properly tolled the statute of limitations by filing an information within the five year period. The subsequent indictment, filed on July 1, 2020, related back to that filing, and Appellant was, therefore, timely charged and prosecuted. Accordingly, we reject Appellant's argument that the district court erred in failing to dismiss the charges against him as untimely.

B.

Fourth Amendment

Appellant contends his Fourth Amendment rights were violated in several ways during the investigation following the murders. First, Appellant contends his rights were violated when investigators used a cell site simulator to obtain his location. Second, Appellant contends that police had no right to search the apartment where they found him because the warrant they relied upon did not advise the judge that a cell site simulator had been used. And third, Appellant contends that police lacked authority to search his person when they entered the apartment, and that he had standing to challenge their search as an overnight guest. The Government contests each of these arguments.

Below, Appellant moved to suppress the evidence and subsequent searches procured through use of cell site data, including the searches of his phone, his person, the apartment where he was found, and his location data. After holding a hearing on the motion to suppress, the district court denied the motion.

We review the district court's factual findings for clear error and its legal determinations *de novo*. *United States v. Abdallah*, 911 F.3d 201, 209 (4th Cir. 2018).

13

Because the motion to suppress was denied, we review the facts in the light most favorable to the Government. *Id.*

### 1.

First, Appellant contends that the police lacked authority to use a cell site simulator to obtain his location because they never obtained a search warrant to do so. The Government responds that the police obtained the functional equivalent of a warrant: "a tracking order," procured pursuant to Maryland law, that "authorized police to track [Appellant's] location in real time." Response Br. at 27; *see also* J.A. 109–114 (reproducing the Application for Order to Obtain Electronic Device Location Pursuant to Md. Code Ann., Crim. Proc. § 1-203.1).[7] The Government emphasizes that a tracking order of the kind police obtained here required them "to swear, upon a written affidavit, that a factual basis existed for finding probable cause that the location information was or would lead to evidence of a crime." Response Br. at 28 (citing Md. Code Ann., Crim. Proc. § 1-203.1(b)(1)(ii), (b)(2)).

A search warrant may not issue without probable cause. *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citing U.S. Const. amend. IV). Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). A judge's decision to issue a search warrant is reviewed with "great deference" -- they need only "a 'substantial basis' for finding probable cause." *United States v. Jones*, 942 F.3d 634, 638 (4th Cir.

---

[7] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

14

2019) (quoting *Gates*, 462 U.S. at 236–38). As applied to warrants, the Fourth Amendment's "particularity" requirement means "the executing officer reasonably can ascertain and identify from the warrant the place to be searched and the items to be seized." *Blakeney*, 949 F.3d at 861 (citing *United States v. Owens*, 848 F.2d 462, 463 (4th Cir. 1988)). We review the validity of a warrant de novo. *Jones*, 942 F.3d at 638.

The investigators in this case obtained a tracking order which authorized them to use a cell site simulator. Maryland law provides a procedural mechanism for executing a search by means of cell site simulator. *See generally* Md. Code Ann., Crim. Proc. § 1-203.1. "A court may issue an order authorizing . . . a law enforcement officer to use a cell site simulator or obtain location information from an electronic device after determining from [an application prescribed by the statute] that there is probable cause to believe" that the information sought is evidence of a crime or will lead to evidence of a crime. Md. Code Ann., Crim. Proc. § 1-203.1(b)(1)(ii). Baltimore City Police used this statutory procedure to obtain a tracking order in this case. They submitted an application for a tracking order with a supporting affidavit, which was granted by a state circuit court judge.

Appellant does not even address the tracking order application or the judge's order. Nonetheless, our review of the tracking order indicates that, like a search warrant, it set forth the requirement of probable cause and provided facts supporting probable cause. *Jones*, 942 F.3d at 638 (asking whether judicial officer had "substantial basis" for identifying a "fair probability that contraband or evidence of a crime will be found in a particular place") (citing *Gates*, 462 U.S. at 238). The application for a tracking order required the affiant officer to swear that there was "probable cause to believe that a

15

misdemeanor or felony has been, is being, or will be committed by the owner of the [cell phone.]" J.A. 109. It required the affiant to swear that "there is probable cause to believe that the location information being sought is evidence of, or will lead to evidence of, the misdemeanor or felony being investigated." *Id.*

It then set forth the phone number that was the subject of the search, Appellant's identity, and the facts supporting probable cause. These facts included a description of the crime scene at Jeffrey's home; the fact that Appellant's cell phone number was the last number dialed on the phone belonging to Jeffrey; that Appellant was the last person to see Jeffrey (according to her family); and that Appellant was the last person to speak with the Jeffrey via cell phone. Further, the affiant officer noted that Appellant discontinued a prior pattern of calls to the victim around the time of the murder. A judge for the Circuit Court of Maryland for Baltimore City granted the officer's application and authorized the tracking order.

Accordingly, we reject Appellant's argument that the Government lacked probable cause to use a cell site simulator to obtain his location information.

### 2.

Next, Appellant contends the police lacked authority to search the apartment where they found him because the warrant they obtained omitted the fact that police used a cell site simulator to discover Appellant's location. The Government points out that police did not rely on the warrant to search the apartment because they obtained consent to enter and because their subsequent actions which led to finding Appellant in the apartment were taken as part of a protective sweep.

16

While the Fourth Amendment generally prohibits warrantless searches, "valid consent to seize and search items provides an exception to the usual warrant requirement." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  Consent is "valid" if it is "knowing and voluntary" and "given by one with authority to consent." *Id.* (citations omitted).  Consent may be "inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003).  "And because the question is one of fact, review on appeal is conducted under the clear error standard." *United States v. Azua-Rinconda*, 914 F.3d 319, 324 (4th Cir. 2019) (citing *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc)).

Following a hearing on Appellant's motion to suppress, the district court held that investigators obtained consent to search the apartment and detained Appellant pursuant to a lawful protective sweep.  J.A. 625 ("[T]his Court concludes that officers lawfully entered Apartment 202 with consent.").  The court determined that when officers arrived at apartment 202 where Appellant was located, they knocked on the door, and "the man who opened the door appeared to answer the officer calmly and step back so as to allow officers into the residence." *Id.*; *see also id.* at 388–89 (investigating officer testifying the occupant "[k]ind of stepped back and -- as if to wave him or allow the Baltimore Police officer and subsequent officers in").  The court thus held, "Nothing in the record, including the statements of the individual who opened the door himself, supports a finding that the consent in this case was anything but voluntary." *Id.*

Appellant presents no reason to doubt the district court's determination that officers had consent to enter apartment 202.  Thus, we reject Appellant's argument that the search

17

of apartment 202 was unlawful on the basis that officers did not specifically state in the search warrant application that they had relied on information obtained via a cell site simulator. The officers did not rely on the search warrant because they had consent to enter the apartment. *See Azua-Rinconda*, 914 F.3d at 325 (holding the district court did not clearly err "in finding that consent to enter was given voluntarily" when occupant "opened the door . . . and with a degree of graciousness invited the officers into the trailer").

3.

Last, Appellant argues that police lacked authority to search his person once they entered the apartment and that, as an overnight guest, he had standing to challenge their search. Appellant emphasizes that the district court "erroneously focused on the issue that he was not a true overnight guest . . . , ignoring the fact that the appellant's argument was that the standing issue did not relate to the apartment search but related to the search and seizure of the appellant's person and possessions." Response Br. at 14. The Government counters that police had authority to search Appellant's person during their protective sweep of the apartment.

A warrantless protective sweep "can be justified when law officers have an interest 'in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.'" *United States v. Everett*, 91 F.4th 698, 709 (4th Cir. 2024) (quoting *Maryland v. Buie*, 494 U.S. 325, 333 (1990)). This exception to the warrant requirement requires "'articulable facts which, taken together with the rational inferences

18

from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.*

We conclude that the officers lawfully detained Appellant in the course of a lawful protective sweep of the apartment. Following the motion to suppress hearing, the court below determined that "officers . . . saw several individual[s] running towards the back room"; officers "conducted a protective sweep of the apartment to locate all individuals and ensure that there was no threat to law enforcement"; and "[i]n the course of their protective sweep, officers located [Appellant] on a couch in a common room [and] confirmed his identity." J.A. at 625–26.

Appellant does not contend that any part of this sweep was unlawful. Rather, he argues that the district court erroneously determined that Appellant did not have standing to challenge the search of the apartment because he was not an overnight guest. But the standing issue is beside the point. Even assuming standing, the officers' seizure of Appellant was justified by their need to conduct a protective sweep of the apartment.

Accordingly, we reject Appellant's argument that the search and seizure of his person was unconstitutional.

C.

*Brady* Evidence

Appellant contends that the Government committed a *Brady* violation by failing to follow up on possible evidence tied to a security camera found in the kitchen of the murder victims. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

19

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). When evidence may only be "potentially useful," a defendant must show that the Government acted in "bad faith" in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). To establish a *Brady* violation, a defendant must prove that the evidence at issue was "(1) favorable to the defendant (either because it was exculpatory or impeaching), (2) material to the defense (that is, prejudice must have ensued), and (3) suppressed (that is, within the prosecution's possession but not disclosed to [the] defendant)." *United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019) (citing *United States v. Sarihafard*, 155 F.3d 301, 309 (4th Cir. 1998)).

A crime scene technician determined that the camera was not operational and a detective assigned to the case corroborated the technician's report. Nonetheless, Appellant argues on appeal that the Government should have determined whether Comcast, the service provider associated with the security camera, retained any video footage. The Government responds that *Brady* does not impose upon it an affirmative obligation to seek out exculpatory evidence; that the ostensible footage was never in the Government's possession such that *Brady* does not apply; and that, in any case, there was no reason beyond mere speculation to think there might be footage on a broken camera.

Appellant's *Brady* argument fails in two respects. First, he cannot demonstrate that the footage on the camera would have been favorable to his case. Appellant can only speculate as to what the footage would have shown, and "rank speculation as to the nature of the allegedly suppressed materials . . . cannot establish a *Brady* violation." *Young*, 916 F.3d at 383; *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) ("Because Caro can

20

only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be [favorable]."). And second, Appellant cannot demonstrate that the Government suppressed favorable evidence -- it never had possession of the recording to begin with because the camera was broken. *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001) (noting that a defendant must show "that the prosecution had the materials and failed to disclose them"). Thus, Appellant fails to satisfy the test of *Brady*, not to mention the higher "bad faith" showing required to demonstrate a violation under *Youngblood*, which arguably applies here because the evidence was only "potentially useful" to Appellant. *Youngblood*, 488 U.S. at 55, 58. Thus, we reject Appellant's argument that the Government committed a *Brady* violation by failing to follow up on whether any footage was contained on the broken camera.[8]

### D.

### Alleged Use of Perjured Testimony

Appellant contends that the Government used perjured testimony in order to secure his conviction. Appellant argued in his briefing and at oral argument that the Government knowingly relied on false testimony, but Appellant provides no evidence demonstrating that any specific testimony relied upon to secure his conviction was false, much less that the Government knowingly suborned perjury. Appellant argues that three witnesses who

---

[8] Appellant also argues that the Government committed a *Brady* violation by failing to check whether security cameras near the house had footage from the time of the murder. For the same reasons discussed, we reject Appellant's argument about a *Brady* violation relating to these cameras as well.

testified against him at trial gave equivocal, and sometimes contradictory, testimony. The Government responds that these arguments attack the witnesses' credibility and the weight of their testimony, but that Appellant has not proved the testimony they gave was actually false.

In general, the Government's knowing use of false testimony to acquire a conviction violates due process. *United States v. Barko*, 728 F.3d 327, 335 (4th Cir. 2013) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "A new trial is required when the government's knowing use of false testimony could affect the judgment of the jury." *Id.* (citing *Giglio v. United States*, 450 U.S. 150, 154 (1972)). To obtain relief upon a claim that the Government used false testimony, Appellant must establish that the Government knowingly used false testimony, creating a false impression of material fact. *Id.* And Appellant bears "the heavy burden of showing that [witnesses] testified falsely." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).

In attempt to support his argument, Appellant points to the testimony of three witnesses:

- Kiara Haynes testified that she conspired with Appellant to acquire a gun, rob the victim of the drugs in her possession, and then murder the victim. Appellant emphasizes that Haynes "lied to the government on numerous occasions prior to her testimony at trial." Opening Br. at 23 (citing J.A. 1628). Specifically, Appellant points to Haynes's testimony that she lied before the grand jury.

- Alfred Harris, III, Appellant's uncle, testified that Appellant confessed to killing both victims, including Jeffrey's young son, K.B., who Appellant was worried might be a witness against him. Appellant argues Harris's testimony was unreliable because Harris had a long history of heroin use and

an extensive criminal record.  Appellant also points out that when Harris was first interviewed by police, he insisted he knew nothing about the murders.  It was not until later that he agreed to cooperate with the Government, including by wearing a wire during conversations with Appellant.

•      Wane Briscoe testified that he gave Appellant a car ride on the day after the murders and that Appellant made incriminating statements to him.  Appellant argues that Briscoe was unreliable because he had previously lied to police, telling them he did not sell drugs (even though he did) and that he knew nothing about the murders, "leaving open the question was he lying previously or was he lying now."  Opening Br. at 25–26.

Appellant argues that these witnesses were not credible because they changed their stories or otherwise indicated they were unreliable.  Regarding Haynes specifically, Appellant argues she had "credibility issues."  Opening Br. at 24.  Regarding Harris, Appellant argues he had "credibility problems."  *Id.* at 25.  And regarding Briscoe, Appellant argues he was "another unreliable witness" who changed his story.  *Id.*

These credibility issues and contradictions are not equivalent to false testimony. *Griley*, 814 F.2d at 971 ("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.").  And credibility and reliability were for the jury to decide.  "[W]e are not entitled to assess witness credibility." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (quoting *United States v. Taylor*, 659 F.3d 339, 343 (4th Cir. 2011)) (internal quotation marks omitted).  Appellant had an opportunity to challenge the credibility of these witnesses on cross examination.  The jury heard the testimony, including the cross examination, weighed the evidence, including the reliability of the witnesses, and convicted Appellant.

23

Accordingly, we reject Appellant's argument that the Government knowingly relied upon false testimony to secure his conviction.

E.

Rule 29: Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to convict him on two bases: (1) the Government charged Appellant with heroin related charges, but it never proved that the substance in question was, in fact, heroin; and (2) the Government never proved that the robbery and murder affected interstate commerce. The Government responds that (1) there was witness testimony that Appellant sold heroin, and, in any case, proving the specific substance at issue was not a required element of the drug offenses; and (2) no nexus to interstate commerce was necessary because Appellant was charged with multiple predicate offenses that did not all require such a nexus, and, in any case, it did prove a nexus.

"We review de novo a district court's denial of a motion for judgment of acquittal." *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023). The verdict must be upheld if it is supported by substantial evidence, and we review the evidence in the light most favorable to the Government. *United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008).

1.

Drug Charges

Appellant challenges the sufficiency of the evidence on Count One, conspiracy to distribute heroin, and Count Two, possession with intent to distribute heroin. Appellant argues that these counts should have failed due to the lack of evidence that the substance in question was, in fact, heroin. Appellant points out that no drugs were seized in this case

24

and that witness testimony suggested that the substance in question was actually liquid Percocet, or oxycodone rather than heroin.

The Government responds that it did not need to prove the actual chemical composition of the substance at issue because the Government introduced lay testimony sufficient to prove that Appellant possessed, distributed, and conspired to distribute heroin. Specifically, Alfred Harris, Appellant's uncle, testified that he sometimes bought heroin from Appellant. As a longtime heroin user, Harris testified that he was familiar both with the appearance and effects of heroin. Further, one of Appellant's cousins, Briscoe, testified that Appellant asked him to help sell heroin. Appellant's supplier, Williams, testified that Appellant was attempting to buy heroin, but that the supplier was producing liquid hydrocodone and other substances, which Appellant believed were heroin.

The Government also argues that the specific substance Appellant was trafficking is not decisive because the charging statute for Count Two requires only "specific intent to distribute a controlled substance or to possess with intent to distribute a controlled substance." *United States v. Ali*, 735 F.3d 176, 186 (4th Cir. 2013). "[I]t does not require . . . specific knowledge of the controlled substance." *Id.* The Government argues that the same is true of the Count One, the conspiracy count because that count borrows the mens rea of the charge for possession with intent to distribute.

We agree with the Government on both points. The circumstantial evidence was sufficient for the jury to find that Appellant possessed, distributed, and conspired to distribute heroin. *See United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976) ("[L]ay testimony and circumstantial evidence may be sufficient, without the introduction of an

25

expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction."); *United States v. Scott*, 725 F.3d 43, 45 (4th Cir. 1984) ("[T]he character of cocaine . . . may be established circumstantially by lay testimony . . . ."); *United States v. Uwaeme*, 975 F.2d 1016, 1019–20 (4th Cir. 1992) (same). Two witnesses testified that Appellant was selling heroin, including a longtime user who recognized the appearance and effect of the drug. *See Dolan*, 544 F.2d at 1221 ("Such circumstantial proof may include evidence of the physical appearance of the substance [and] evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug . . . ."); *Scott*, 725 F.2d at 46 ("The substance had the appearance of illicit cocaine; when sampled and tested by an experienced user of cocaine, it had the effect of cocaine . . . ."). There was also testimony that Appellant was buying what he at least intended was heroin from his supplier. *See Scott*, 725 F.2d at 46 (affirming the Government's use of testimony that "all persons dealing with the substance treated and dealt with it as cocaine"). All of this testimony combined was sufficient for a jury to find that Appellant possessed, distributed, and conspired to distribute heroin. *See Reid*, 523 F.3d at 317 ("[W]e will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence.").

Further, regardless of the specific chemical composition of the drug at issue, the evidence was sufficient for the jury to convict. *See Uwaeme*, 975 F.2d at 1020 ("[W]e will uphold a conviction as long as the evidence that the substance was illegal is adequate.") (citing *Scott*, 725 F.2d at 45 (4th Cir. 1984)). The act prohibited by the statute under which Appellant was charged, 21 U.S.C. § 841(a), is "knowingly or intentionally"

26

"manufactur[ing], distribut[ing], or dispens[ing], or possess[ing] with intent to manufacture, distribute, or dispense, a controlled substance." The Government is correct that the jury could have found Appellant guilty of violating that statute whether the substance at issue was heroin, liquid oxycodone, or liquid hydrocodone. *Ali*, 735 F.3d at 186 ("Thus, while the statute requires specific intent to distribute *a controlled substance* or to possess with intent to distribute *a controlled substance,* it does not require that the defendant have, within that intent, specific knowledge of the controlled substance or any of the chemicals, derivatives, isomers, esters, ethers, or salts that constitute the controlled substance.") (emphasis in original); *see also United States v. Barbosa,* 271 F.3d 438, 458 (3d Cir. 2001) ("[T]he structure and plain text of § 841 affords no support for a requirement that the Government must prove more than the defendant's knowledge that he was trafficking in a controlled substance."). The same analysis applies to Count One, the conspiracy count, pursuant to 21 U.S.C. § 846. *Ali*, 735 F.3d at 186 ("Because § 846 looks to an underlying offense, the mens rea of § 846 is derived from that of the underlying offense, in this case § 841(a)."). "Of course, the fact that the defendant must only know that the [substance] he is distributing or possessing with intent to distribute contains an unspecified *controlled substance* does not relieve the government of proving that that substance was in fact on the controlled substance list." *Id.* (emphasis in original). But here, that is not at issue because liquid hydrocodone and oxycodone are Schedule II controlled substances, just as heroin is a controlled substance. 21 C.F.R. § 1308.12.

Therefore, we reject Appellant's argument that the evidence was insufficient to convict him on Counts One and Two.

27

2.

Robbery and Murder

Appellant also challenges the sufficiency of the evidence on Counts Four and Five, use and carry of a firearm during and in relation to a drug trafficking crime and a crime of violence, causing the two murders. He contends that the evidence was insufficient to convict on these counts because the Government did not prove a nexus to interstate commerce.

The Government argues that Appellant misunderstands the charging statute -- that he is presupposing that the "murder" element of § 924(j)(1) means felony murder with Hobbs Act robbery as a predicate offense. And since Hobbs Act robbery requires a nexus to interstate commerce, Appellant therefore asserts the Government was required to prove that nexus.

The elements required for the Government to prove Counts Four and Five, are (1) a predicate § 924(c) drug-trafficking offense or crime of violence; (2) use of a firearm during and in relation to the predicate offense; and (3) that in the course of using the firearm, Appellant caused the murder of another person. *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007). "Murder," in turn, means "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. Appellant does not identify under which element he believes the Government was required, yet failed, to prove a nexus to interstate commerce. Even liberally construing his argument as related to the first and third elements, it is without merit in either instance.

28

The first element -- a predicate offense -- was supported by substantial evidence. Because one of the predicate § 924(c) offenses was Hobbs Act robbery, the district court instructed the jury as to the elements of that offense, including the nexus to interstate commerce element. But the Government did not need to prove Hobbs Act robbery, because that was only one of three possible predicate offenses. The other two offenses were the conspiracy and drug trafficking crimes alleged in Counts One and Two, which, as discussed above, were supported by substantial evidence. Because the Government proved these counts, the predicate element was satisfied, and there was sufficient evidence for the jury to convict on the two § 924(j)(1) counts. *See United States v. Said*, 26 F.4th 653, 659 (4th Cir. 2022) ("[A] § 924(c) conviction may stand even if the jury based its verdict on an invalid predicate, so long as the jury also relied on a valid predicate.").

The second element -- causing murder with a firearm -- was also supported by substantial evidence. Alfred Harris, Briscoe, and Tonya Harris each testified that Appellant confessed to killing Jeffrey and K.B. Haynes testified that she and Appellant planned to rob Jeffrey of the narcotics and kill her with the .45 caliber gun, and that Appellant admitted to having killed both Jeffrey and K.B. The victims were discovered with gunshot wounds at the crime scene, and a forensic pathologist testified that Jeffrey and K.B. died from gunshot wounds. Thus, there was substantial evidence from which the jury could find "the unlawful killing of a human being with malice aforethought" as to both Jeffrey and K.B. 18 U.S.C. § 1111.

As a result, we reject Appellant's argument that the evidence was insufficient to convict him of the murder charges and we affirm the district court's denial of Appellant's motion for judgment of acquittal.

III.

In sum, we reject each of Appellant's contentions on appeal. The judgment of conviction is

*AFFIRMED.*